UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

———

BERNARD HARDRICK,

        Plaintiff,                    Case No. 2:20-cv-258

v.                                          Hon. Hala Y. Jarbou

RICKY WONNACOTT, et al.,

        Defendants.
_____/

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Michigan Department of Corrections, Anderson, McCollum, and Theut. The Court will also dismiss, for failure to state a claim, Plaintiff's due process claim against Defendant Simpson. Plaintiff's retaliation claims against Defendants Wonnacott, Lemmerman, Simpson, and McKinney remain in the case.

**Discussion**

I.      **Factual Allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues the MDOC, MDOC Hearings Officer Unknown Theut, and the following MBP officials: Prisoner Counselor (PC) Ricky Wonnacott; Correctional Officers John Lemmerman, Unknown Simpson, and Unknown McKinney; Sergeant Anderson; and Hearings Investigator John McCollum.

Plaintiff alleges that, on January 7, 2020, while Plaintiff was in the chow hall, Defendant Lemmerman conducted a search of his cell. Defendant Lemmerman confiscated Plaintiff's coffee and legal mail. When Plaintiff asked, Lemmerman denied knowing anything about the legal mail, but acknowledged taking the coffee, advising that the coffee was payment for not writing Plaintiff up for any contraband that might be found in the future. Before walking away, Plaintiff told Lemmerman that he intended to write a grievance, because Lemmerman had taken his property without due process. Plaintiff went to Defendant Wonnacott's office. He told Wonnacott what Defendant Lemmerman had done, and he requested a grievance form. Defendant Wonnacott told Plaintiff that he did not have any grievance forms.

Plaintiff then drafted his own four-page grievance, as well as a complaint for filing in small claims court. On January 8, 2020, Plaintiff approached Wonnacott and asked him to notarize the small claims complaint, which, Plaintiff contends, is required to be notarized. When Wonnacott saw that the complaint was written against Defendant Lemmerman, Wonnacott refused to notarize it, claiming that he did not notarize complaints against other staff members. Believing that Wonnacott's refusal to notarize the complaint affected his ability to access the courts, Plaintiff drafted a grievance against Defendant Wonnacott.

2

Later that day, Plaintiff attempted to use the phone. While he was dialing, the unit was shut down for chow. Defendant Wonnacott approached Plaintiff, asked for his identification, and ordered Plaintiff to hang up the phone. However, Wonnacott told another prisoner that he could continue to use the phone. Defendant Simpson called Plaintiff to the officer's station and informed him that Defendant Wonnacott had written Plaintiff a Class-III misconduct ticket for violating a posted rule, because Plaintiff had continued to use the phone after Wonnacott instructed him to hang it up. Defendant Wonnacott also placed Plaintiff on phone restriction. Plaintiff contends that Defendant Wonnacott's actions were retaliatory.

On January 9, Plaintiff went to the officer's station, where Defendant Simpson informed Plaintiff of the Class-III misconduct and offered him three days' loss of privileges to settle the misconduct ticket. Plaintiff signed off on the charge, but noted on the form that his signature was in consideration of $10,000.00.

Later that evening, when Plaintiff returned from the chowhall, he found his legal materials "sabotaged and dumped all over his bunk . . . some of the documents were torn." (Compl., ECF No. 1, PageID.5.) Plaintiff complained to Correctional Officer Wech (not a defendant) at the officer's station and asked to speak with a sergeant. Wech denied the request. Plaintiff complained that, according to MDOC policy, following a search, an inmate's property should be left in the condition it was found. While Plaintiff was complaining to Wech, Defendant Simpson approached. Plaintiff asked if Defendant Simpson had performed the shake down and complained about the condition of his legal property. Defendant Simpson told Plaintiff to file a grievance. Plaintiff wrote a grievance against Simpson. Later that evening, Defendant Simpson filed an allegedly false and retaliatory misconduct ticket for being out of place and insolent.

3

The following day, January 10, 2020, Plaintiff went to breakfast at 6:20 a.m. He intended to drop off his grievance in the chowhall grievance box, but he forgot. He asked Defendant McKinney if he could go back to drop off his grievance, and McKinney allowed him to do so. When Plaintiff was returning, Defendant Lemmerman asked where Plaintiff was coming from. Plaintiff responded that he had been to the chowhall. Defendant McKinney queried why, knowing that Plaintiff had already eaten. Plaintiff explained that McKinney had given him permission to drop off a grievance. Defendant Lemmerman asked Defendant McKinney if he had given permission, and McKinney responded that he should have denied the request, given that it was for a grievance. Defendant McKinney then wrote Plaintiff a misconduct ticket for being out of place.

Later that day, both Lemmerman and McKinney wrote misconduct reports for violating posted rules, because Plaintiff had hung a laundry bag on his locker. Plaintiff claims there was no official rule against the practice and that it had never been a problem before. He contends that the duplicative misconduct charges were retaliatory. Plaintiff asked to sign off on the tickets, so that he could record in writing that they were retaliatory. Defendant Simpson refused Plaintiff's request, asking why he would want to do such a thing. Simpson added that if Plaintiff came during count and gave Simpson a good blow job, Simpson might allow it and might tell officers to ease up on Plaintiff.

On January 11, Defendant Lemmerman summoned Plaintiff for a hearing on the misconduct filed by Wonnacott and to review Plaintiff on the notice of intent to implement a phone restriction. Defendant Lemmerman refused to accept Plaintiff's "Notice of Defense." Lemmerman then imposed a misconduct sanction of 3 days' loss of privileges. Plaintiff signed off on a 30-day phone restriction for abusing phone privileges, but he noted that the notice of intent

4

was retaliatory. Lemmerman also threatened an additional 30-day phone restriction for filing grievances. Plaintiff filed a grievance that same date.

Sometime later that day, Plaintiff was reviewed on the out-of-place misconduct ticket written by Defendant McKinney. Plaintiff again signed off, indicating that the ticket was retaliatory and accepted for consideration of $20,000.00.

On January 12, Plaintiff was summoned to the officer's station, where he was met by a sergeant for a review on a Class-II misconduct ticket for disobeying a direct order. The ticket alleged that Defendant Lemmerman told Plaintiff not to write anything on the notice of intent, but just to sign it. Plaintiff signed the misconduct ticket, again indicating that it was retaliation.

During second shift on January 13, Plaintiff was reviewed by Correctional Officer Sayers (not a Defendant) on the two misconduct tickets. Plaintiff submitted "Notice of Defense" statements, stating that the tickets were issued in retaliation for his grievances. Sayers then told Plaintiff to leave. Plaintiff looked back over his shoulder as he left, and he witnessed Defendant Simpson take the documents Plaintiff had provided from Sayers. A couple of hours later, Plaintiff was called to the officer's station, where he was informed by a lieutenant that he was to go to early chow before going to the Special Acts building for a hearing on the Class-II misconducts that were pending against him.

Plaintiff reported for the hearing on Defendant McKinney's out-of-place misconduct charge and Defendant Lemmerman's disobeying-a-direct-order misconduct charge. Plaintiff pleaded not guilty to both charges, and he provided his written "Notice of Defense" to Lieutenant Watson (not a defendant). In his defense, Plaintiff alleged that Defendant Lemmerman never ordered him not to write anything on notice-of-intent documents, that the misconduct charge was issued in retaliation for the filing of grievances, and the charge violated Plaintiff's right to

freedom of speech. Plaintiff alleged that Defendant McKinney filed the charge of being out of place, despite Plaintiff having received permission to return to the chowhall, in retaliation for the filing of grievances. Lt. Watson told Plaintiff that he would look into the matter, but two weeks later, Plaintiff received Watson's decisions of guilt.

When Plaintiff returned to the unit, he asked Sayers the results of the allegedly duplicative Class-III misconduct charges written by Defendants Lemmerman and McKinney. Sayers pointed toward the hearing reports she had completed, in which she found Plaintiff guilty of the two misconduct charges.

Plaintiff returned to his cell and did not proceed to lunch, as he already had eaten. Less than five minutes later, Defendant Simpson came to Plaintiff's cube. Simpson told Plaintiff to leave the cube while Simpson conducted a search. Plaintiff went into the bathroom and watched from the window. He saw Defendant Simpson leave Plaintiff's cell with nothing in his hand. As Simpson passed Plaintiff, Simpson winked. Plaintiff assumed that the wink was a signal to return to his cube. When he returned, Plaintiff found that Simpson had left his possessions and legal materials in disarray and that Plaintiff's locker was still open. Plaintiff proceeded to clean up. Thirty minutes later, Defendant Simpson, accompanied by a sergeant and two yard officers, ordered Plaintiff to turn around and cuff up. Plaintiff complied, and he was taken to segregation.

When Plaintiff asked why he had been taken to segregation, Officer Smart (not a defendant) told him that he was charged with a Class-I misconduct for possession of a weapon. Smart then reviewed the misconduct charge with Plaintiff, showing Plaintiff a picture of a weapon lying next to a ruler that was purportedly taken from Plaintiff's area of the cell. Officer Smart asked Plaintiff to sign for the ticket and asked if Plaintiff wanted a hearing officer. Plaintiff responded affirmatively to both. When Plaintiff began to write "retaliation" on the ticket, Smart

6

attempted to take the ticket away from him. Plaintiff, however, retained his grip and completed the form in his cell, saying, "Retaliatory ticket, Accepted in consideration of $50,000 . . . ." (*Id.*, PageID.11.) After Plaintiff returned the ticket to Officer Smart, Smart provided Plaintiff a copy of the misconduct report. However, the report listed Sergeant Anderson as the reviewing officer, not Officer Smart, and he noted that the "refused to sign" box was checked on the form. (*Id.*)

The following morning, January 14, 2020, Defendant Hearings Investigator McCollum came to Plaintiff's cell and asked if Plaintiff wanted a hearings investigator. Plaintiff responded affirmatively. McCollum then read the ticket to Plaintiff, which stated that Defendant Simpson had conducted a random search, finding in Plaintiff's locker a piece of plastic, sharpened to a point, and hidden under a laundry bag and inside of a folder. The plastic had a handle made of an Ace bandage and dental floss. McCollum asked Plaintiff to state his defense. Plaintiff asked to see the picture again, and he noticed that the photo did not contain a time and date stamp. Plaintiff informed McCollum that Defendant Simpson had filed a false misconduct, and he asked McCollum to conduct the following investigations: review the video footage of the shakedown to see if Simpson retrieved anything from Plaintiff's area; inspect the camera that purportedly was used, to see if there was a time and date indication; ask both the PREA and grievance coordinator if they spoke with Simpson about Plaintiff's grievances; ask Plaintiff's cellmates to confirm Plaintiff's problems with Simpson; and allow Plaintiff to take a polygraph test. Defendant McCollum asked Plaintiff why he thought Defendant Simpson would set him up. Plaintiff explained about his grievances and the prior retaliation from C-Unit staff. He then asked McCollum to review the video to determine whether Defendant Simpson went to the contraband locker or printed a contraband photo before doing the search. McCollum responded that Simpson did not have access to the contraband locker. McCollum drafted an incomplete "Prisoner

7

Statement" form, and Plaintiff provided a "Notice of Defense" for the record. Believing that Defendant Simpson must have printed the photo from a computer before conducting the search, Plaintiff sent a kite to Hearings Officer Dave Toy,[1] explaining his theory.

On January 16, Defendant Hearing Officer Theut conducted a hearing. Plaintiff pleaded not guilty. Defendant Theut reviewed the evidence, including a confidential video, various witness refusal forms, a contraband removal form, and memos from the PREA coordinator and the grievance coordinator. Defendant Theut asked if Plaintiff had anything else, and Plaintiff again referred to the undated photo and the lack of an actual weapon. Defendant Theut found Plaintiff guilty, indicating that there was no relevant video, that Plaintiff was responsible for his area of control, the officer's statement was clear and detailed, and, notwithstanding the lack of a date on the photo, there existed no credible evidence that the reporting officer was lying. Defendant Theut imposed a sanction of 10 days of detention in punitive segregation and 30 days of toplock. (Compl., ECF No. 1, PageID.13; Hr'g Report, ECF No. 1-10, PageID.78–79.)

Plaintiff argues that Defendant McCollum failed to investigate and to provide video evidence, failed to inspect the actual camera and weapon, failed to obtain the desired statement from the grievance coordinator, failed to obtain witness statements, and failed to question Defendant Simpson. Plaintiff argues that Defendant Theut violated Michigan law by making a finding of guilt that was not supported competent, material, and substantial evidence.

Plaintiff lists a number of legal claims against the individual Defendants. He argues that Defendant Wonnacott filed a misconduct charge and imposed phone restrictions in retaliation for Plaintiff's exercise of his First Amendment right to petition government. He also contends that Defendant McKinney filed a false, retaliatory, and duplicative "out of place" misconduct, in

---

[1] Hearings Officer Toy is not a defendant in this action, and he is not otherwise mentioned in the complaint.

violation of the First Amendment. Plaintiff alleges that Defendant Lemmerman engaged in two retaliatory actions in response to Plaintiff's grievances: filing a false misconduct based on Plaintiff's writing the word "retaliation" on the notice of intent to impose phone restriction; and filing a duplicative Class-III misconduct for violating posted rules. Plaintiff claims that Defendant Simpson retaliated against him in violation of the First Amendment and denied him procedural due process, by filing a false and retaliatory Class-I misconduct ticket for possessing a weapon. Plaintiff asserts that Defendant Anderson violated Plaintiff's right to procedural due process when he failed to investigate the Class-I misconduct charge issued by Defendant Simpson, failed to inspect the weapon, and failed to conduct initial review on the charge in accordance with prison policy. In addition, Plaintiff complains that Defendant McCollum denied him due process by failing to investigate Plaintiff's witness personally, failing to inspect the evidence, and failing to review the surveillance video and camera used by Simpson. Plaintiff also contends that Defendant Theut conducted an inadequate hearing and reached a unsupported decision in the Class-I misconduct hearing, thereby denying Plaintiff procedural due process. Finally, Plaintiff alleges that Defendant MDOC is responsible for the due process violations, because it upheld the misconduct conviction for possession of a weapon and did not take actions against Defendants.

In addition to his federal claims, Plaintiff argues that Defendants' conduct constituted a breach of contract, a violation of Defendants' oath of office, and a violation of state law and administrative rules.

For relief, Plaintiff seeks an injunction removing the Class-I misconduct conviction from his record. He also seeks compensatory and punitive damages.

## II. Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*

9

*v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### III. Sovereign Immunity

Plaintiff may not maintain a § 1983 action against the MDOC. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from a § 1983 suit under the Eleventh Amendment. *See*, *e.g.*, *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013); *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653–54 (6th Cir. 2010). Therefore, Plaintiff's claim against the MDOC is properly dismissed on grounds of immunity.

In addition, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989)); *Harrison*, 722 F.3d at 771. Therefore, Plaintiff's claim against the MDOC also is properly dismissed for failure to state a claim under 28 U.S.C. §§ 1915(e)(2)(B)(iii), 1915A(b), and 42 U.S.C. § 1997e(c).

### IV. Procedural Due Process

Plaintiff alleges that Defendants Simpson, Anderson, McCollum, and Theut violated his right to procedural due process in filing, investigating, or conducting hearings on a false Class-I misconduct charge. Plaintiff raises no other legal claim against Defendants Anderson, McCollum, and Theut.

The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient . . . ." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. According to that Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995).

Plaintiff's major misconduct charge and conviction affected a number of Plaintiff's interests, but none of them fall into either of the categories identified in *Sandin* as protected by due process, i.e., an inevitable effect on the duration of Plaintiff's sentence or an atypical and significant hardship. As to the first category, Plaintiff has not alleged a deprivation that will inevitably affect the duration of his sentence. A prisoner like Plaintiff, who is serving an

indeterminate sentence for offenses committed after 2000, can accumulate "disciplinary time" for a major misconduct conviction. *See* Mich. Comp. Laws § 800.34. Disciplinary time is considered by the Michigan Parole Board when it determines whether to grant parole. *Id.* § 800.34(2). It does not necessarily affect the length of a prisoner's sentence because it is "simply a record that will be presented to the parole board to aid in its [parole] determination." *Taylor v. Lantagne*, 418 F. App'x 408, 412 (6th Cir. 2011).

As to the second category, Plaintiff has not alleged that he suffered a "significant and atypical deprivation." Plaintiff notes that he was placed in punitive segregation for a total of 14 days and kept on toplock or room restriction for 30 days. Confinement in administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). Thus, it is considered atypical and significant only in "extreme circumstances." *Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010). Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th Cir. 2008).

In *Sandin*, the Supreme Court concluded that the segregation at issue in that case (disciplinary segregation for 30 days) did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484. Similarly, the Sixth Circuit has held that placement in administrative segregation for two months does not require the protections of due process. *See Joseph*, 410 F. App'x at 868 (61 days in segregation is not atypical and significant). It has also held, in specific circumstances, that confinement in segregation for a much longer period of time does not implicate a liberty interest. *See, e.g.*, *Jones*, 155 F.3d at 812–13 (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir.

13

1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding). Generally, only periods of segregation lasting for several years or more have been found to be atypical and significant. *See, e.g.*, *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (13 years of segregation implicates a liberty interest); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) (eight years of segregation implicates a liberty interest); *Harden-Bey*, 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest).

Plaintiff's confinement in segregation for 14 days is less than the 30-day period in *Sandin* that the Supreme Court held was *not* atypical and significant. Even after adding 30 days of room restriction, the restrictions imposed on Plaintiff were far less significant than the lengthy periods of segregation in *Joseph*, *Mackey*, and *Jones*, which did not implicate a liberty interest. Thus, Plaintiff's confinement in segregation and placement on room restriction did not trigger a right to due process.

The same is true for the loss of yard and phone privileges, the loss of prison employment, and the loss of ability to participate in a religious program—all of which are expected consequences of confinement in segregation. If Plaintiff's confinement in segregation does not implicate a protected liberty interest, it follows that the loss of privileges stemming from that confinement do not implicate such an interest. Furthermore, federal courts consistently have found that prisoners have no constitutionally protected liberty interest in prison vocational, rehabilitation, and educational programs under the Fourteenth Amendment. *See, e.g., Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (Due Process Clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Argue v. Hofmeyer*, 80 F.

14

App'x 427, 429 (6th Cir. 2003) (prisoners have no constitutional right to rehabilitation, education or jobs); *Canterino v. Wilson*, 869 F.2d 948, 952–54 (6th Cir. 1989) (no constitutional right to rehabilitation); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (no constitutional right to rehabilitative services). Moreover, "as the Constitution and federal law do not create a property right for inmates in a job, they likewise do not create a property right to wages for work performed by inmates." *Carter*, 69 F. App'x at 680 (citing *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991), and *James v. Quinlan*, 866 F.2d 627, 629–30 (3d Cir. 1989)). Consequently, Plaintiff's loss of privileges and loss of wages associated with his prison job did not trigger a right to due process.

Plaintiff relies upon prison policies and prison manuals as the source of his right to due process. In other words, he contends that certain policies and prison manuals provide him with state-created rights by specifying requirements and procedures that prison officials must follow when charging a prisoner with misconduct or when investigating that misconduct.

Plaintiff's reliance is misplaced. As the Supreme Court stated in *Sandin*, using "mandatory language in prisoner regulations" as a source for interests protected by due process "stray[s] from the real concerns undergirding the liberty protected by the Due Process Clause." *Sandin*, 515 U.S. at 484. Prison regulations are "primarily designed to guide correctional officials in the administration of a prison." *Id.* at 482. They are not designed "to confer rights on inmates[.]" *Id.* Accordingly, the Court held that state-created interests "will generally be limited to freedom

from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents or prison life." *Id.* (citations omitted). Plaintiff has not alleged that Defendants Simpson, Anderson, McCollum, and Theut imposed such a restraint on him. Thus, he does not state a due process claim against them.

Because the only federal claim that Plaintiff raises against Defendants Anderson, McCollum, and Theut is his procedural due process claim, the Court will dismiss the complaint against Defendants Anderson, McCollum, and Theut.[2]

**V.      Retaliation**

Plaintiff alleges that Defendants Wonnacott, Lemmermn, Simpson, and McKinney engaged in a variety of actions against him in retaliation for his filing of grievances. More specifically, he alleges that Defendant Wonnacott filed a misconduct charge and imposed phone restrictions in retaliation for Plaintiff's exercise of his First Amendment right to petition government. He also contends that Defendant McKinney filed a false, retaliatory, and duplicative "out of place" misconduct, in violation of the First Amendment. Plaintiff alleges that Defendant Lemmerman engaged in two retaliatory actions in response to Plaintiff's grievances: filing a false misconduct based on Plaintiff's writing the word "retaliation" on the notice of intent to impose phone restriction; and filing a duplicative Class-III misconduct for violating posted rules. Plaintiff claims that Defendant Simpson retaliated against him in violation of the First Amendment by filing a false and retaliatory Class-I misconduct ticket for possessing a weapon.

---

[2] The Court notes that Plaintiff's complaint against Defendant Theut is also dismissible on the ground of judicial immunity. *See Shelly v. Johnson*, 849 F.2d 228, 230 (6th Cir. 1988) (holding that Michigan hearings officers, whose duties are set forth at Mich. Comp. Laws § 791.251 through § 791.255, are entitled to absolute judicial immunity from inmates' § 1983 suits for actions taken in their capacities as hearing officers); *see also Barber v. Overton*, 496 F.3d 449, 452 (6th Cir. 2007); *Dixon v. Clem*, 492 F.3d 665, 674 (6th Cir. 2007); *cf. Pierson v. Ray*, 386 U.S. 547, 554-55 (1967) (judicial immunity applies to actions under § 1983 to recover for alleged deprivation of civil rights).

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

On initial review, the Court concludes that Plaintiff's allegations of retaliation by Defendants Wonnacott, Lemmermn, Simpson, and McKinney are sufficient to state a claim.

## VI. State-Law Claims

To the extent that Plaintiff seeks to invoke this Court's supplemental jurisdiction over his state-law claims against the dismissed Defendants, the Court declines to exercise jurisdiction. Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *See Experimental Holdings, Inc. v. Farris* 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims.") (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld*, 994 F.2d at 1182; *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("Residual jurisdiction

should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues.") (internal quotations omitted). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction over the state-law claims against Defendants Anderson, McCollum, and Theut. Accordingly, Plaintiff's state-law claims against them will be dismissed without prejudice.

## VII. Pending Motions

Plaintiff has filed a motion to serve the complaint (ECF No. 3) and a motion for immediate initial screening of the complaint (ECF No. 5). Because initial screening is required under 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c), and given the Court's prior determinations concerning Plaintiff's claims, his pending motions will be denied as moot.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's federal claims against Defendants Michigan Department of Corrections, Anderson, McCollum, and Theut will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court also will dismiss without prejudice Plaintiff's state-law claims against Defendants Anderson, McCollum, and Theut.  In addition, the Court will dismiss, for failure to state a claim, Plaintiff's due process claim against Defendant Simpson.  Plaintiff's retaliation claims against Defendants Wonnacott, Lemmerman, Simpson, and McKinney remain in the case.

An order consistent with this opinion will be entered.


Dated:  June 23, 2021           /s/ Hala Y. Jarbou
                                HALA Y. JARBOU
                                UNITED STATES DISTRICT JUDGE